IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JDR INDUSTRIES, INC., a Nebraska corporation, d/b/a Farmer's Choice,<br><br>       Plaintiff,<br><br>vs.<br><br>EDWIN K. McDOWELL, d/b/a LaGrange Supply Co., and LAGRANGE SUPPLY CO., L.L.C., a Nebraska limited liability company, d/b/a LaGrange Supply Co.,<br><br>       Defendants. | 8:14-CV-284<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on plaintiff JDR Industries' Motion for Preliminary Injunction (filing 8) and Motion for Partial Summary Judgment (filing 34). The present dispute concerns the right to sell welding rod under the name "LaGrange." JDR claims that, through its predecessors-in-interest, it has been continuously using the LaGrange trademark in connection with the sale of welding rod since as early as approximately 1970. Since the mid to late 1980s, defendant Edwin K. McDowell, a former employee of one of those predecessors, has also been selling welding rod under the name LaGrange. At some point in 2014, McDowell incorporated his company, defendant LaGrange Supply Co., LLC ("LG Supply"), and assigned to LG Supply his interest in the LaGrange name (whatever that interest is).

The parties dispute when JDR first became aware of McDowell's sales—but the Court need not resolve that dispute at this time. JDR maintains that it did not pursue any action against McDowell for his infringing activities because his sales were minimal enough that there was no real threat of confusion. In December 2013, however, things changed. Around that time, JDR terminated the employment of one of its salespersons, James Vance. Vance, who is not a party to this case, approached McDowell, and the two entered into a licensing agreement whereby McDowell allowed Vance to sell welding rod under the LaGrange name in exchange for royalties. In contrast to McDowell, who had run an essentially passive sales operation—generally relying on customers to call him—Vance relied on

telemarketing. Moreover, Vance specifically targeted a number of JDR's customers. JDR asserts that this has resulted in significant consumer confusion. This prompted JDR to file suit against Vance in state court. That suit remains pending. The present suit against McDowell and LG Supply followed thereafter. For the reasons discussed below, JDR's motion for partial summary judgment will be granted, as to its claims, and denied, as to defendants' counterclaims. JDR's motion for preliminary injunctive relief will be denied as moot.

FACTUAL BACKGROUND[1]
## I. JDR's Claim to the LaGrange Mark

Plaintiff JDR is a Nebraska corporation. Its president is James J. Braun. Filing 10-2 at ¶ 1. JDR traces its ownership in the LaGrange mark through a chain of predecessors, beginning with LaGrange Equipment Company ("LEC"). LEC was, until its dissolution in April 1986, a Nebraska corporation with its principal place of business in Omaha, Nebraska. Its founder and president was Dan LaGrange. Braun worked for LEC from 1982 to 1985, eventually serving as its Vice President of Marketing. Filing 25-2 at ¶¶ 3–4. At least as early as 1970, and continuing through October 1985, LEC sold welding rod using the LaGrange mark. Filing 10-2 at ¶¶ 2–4. LEC did not produce the welding rod itself, but purchased it from several suppliers. Filing 10-2 at ¶ 6.

Ralston Bank was a secured creditor of LEC. In August 1985, acting in conjunction with its holding company, Ralston Bank foreclosed on its loan to LEC, and acquired all of LEC's assets, equipment, and property, including the rights in the LaGrange name (collectively, the "LEC Assets"). However, Ralston Bank allowed LEC to continue in its operations, and so LEC continued to sell welding rod using the LaGrange mark. Between August 1985 and October 17, 1985, Ralston Bank was the sole owner of the rights to the LaGrange name. Filing 10-2 at ¶¶ 7–8; filing 25-3 at ¶¶ 1–7; filing 25-2 at ¶¶ 1–6; filing 35-2 at ¶¶ 1–8.

Following the 1985 foreclosure, Braun and Dan LaGrange, along with a third partner, formed TGS Marketing, Inc.,[2] which was a Nebraska

---

[1] Pursuant to NECivR 56.1, a party moving for summary judgment must include in its brief a statement of material facts about which the movant contends there is no dispute, and the party opposing summary judgment must include in its brief a concise response to that statement of facts, noting any disagreement. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response. NECivR 56.1(b)(1). The Court has relied upon the parties' respective statements of material fact to the extent that they were not substantively disputed. Where the facts are genuinely in dispute, the Court has credited defendants' version of events.

corporation until its dissolution on July 3, 2003, and which did business as "Farmer's Choice." Filing 10-2 at ¶¶ 9–11. On October 17, 1985, TGS entered into a purchase agreement with Ralston Bank, whereby TGS purchased from Ralston Bank all of the LEC Assets, including the rights to the LaGrange mark. Filing 10-2 at ¶¶ 9–11; filing 10-3 at pp. 1–3; filing 25-2 at ¶¶ 9–11; filing 25-3 at ¶ 8; filing 35-2 at ¶ 9. The transfer of the LEC assets to TGS was essentially a "turnkey operation," whereby TGS opened the following business day doing all of LEC's business out of the same location and using the same office and assets. Filing 25-2 at ¶¶ 11–15. Between October 17, 1985, and June 23, 2003, TGS sold welding rod using the LaGrange mark. Filing 10-2 at ¶¶ 12–13; *see also* filing 10-2 at ¶ 15; filing 10-5.

On June 23, 2003, plaintiff JDR, also doing business as Farmer's Choice, purchased the LEC assets from TGS, including the rights to the LaGrange mark. Filing 10-2 at 16–17; filing 10-6 at 1–2, 7–8, 11. From that point and continuing through the present day, JDR has sold welding rod under the LaGrange mark. Filing 10-2 at ¶¶ 19–20.

## II. Use and Registration of the LaGrange Trademark

JDR and its predecessors-in-interest (TGS and LEC) have sold welding rod using the LaGrange mark since 1970, in over 42 states and Canada. JDR asserts that the LaGrange line of welding rod has become "extremely well known throughout the United States." Filing 10-2 at ¶¶ 22, 25. JDR further asserts that it and its predecessors have spent much time and substantial resources in promoting the LaGrange brand. JDR claims that, as a result, the LaGrange mark has a strong reputation and has built up substantial goodwill, such that the relevant public identifies and associated the LaGrange line of welding rod with JDR and its predecessors. *See* filing 10-2 at ¶¶ 23–32.

On March 20, 2012, the United States Patent and Trademark Office issued JDR a Registration Certificate for the LaGrange mark, for use in the sale of metal welding rods. The certificate identified JDR's first use of the mark in commerce as occurring on December 31, 1969. Filing 10-2 at ¶ 21; filing 10-7 at 1–3.

## III. McDowell's Business

From 1981 to 1985, McDowell worked for LEC as its national sales recruiter. Filing 10-8 at 2–3. McDowell was responsible for selling distributorships for LEC and training and managing four or five other LEC employees involved in such sales. The distributorships that McDowell sold

---

[2] "TGS" was an acronym for "The Grange Supply." Filing 25-2 at ¶ 8.

were composed of counties wherein each distributor could exclusively sell LEC's products. Filing 10-8 at 2–3. After LEC closed in 1985, McDowell partnered with various former regional managers of LEC and continued to sell distributorships on their behalf. Essentially, McDowell continued in his previous capacity as a sales recruiter, but instead of working for LEC, he worked for LEC's former managers. For their part, the former regional managers would then train the new exclusive distributors in the sale of welding rod branded as LaGrange.

At some point in the 1980s, McDowell also began selling welding rod on his own, out of his garage, using the LaGrange mark. McDowell has continued these sales through the present day. Filing 10-8 at 4–6, 14–15, 19, 37; filing 23-1 at ¶¶ 4, 13–15, 23, 28, 35–36. And since 1985, McDowell has conducted his business under the name "LaGrange Supply Co." *See,* filing 23-1 at ¶¶ 4–9, 15; filings 23-2, 23-3, 23-4, and 23-5.[3] In July 1997, McDowell registered the trade name "LaGrange Supply Co." with the Nebraska Secretary of State for use in the "[d]istribution of shop equipment and supplies." Filing 10-8 at 7–8; filing 23-9 at 1–3. McDowell renewed the registration in 2007. Filing 10-8 at 7–8; filing 23-9 at 4.

Until Vance later became involved, McDowell's sales of welding rod were, as JDR terms it, "passive." *See* filing 9 at 9–11. Although McDowell made perhaps 3 to 4 sales calls a week, he was not really running a telemarketing operation, and he primarily relied on customers making calls to him. Filing 10-8 at 11–12. At some point, McDowell had obtained the telephone number formerly used by LEC in its sales of LaGrange welding rod. McDowell would get calls from LEC's former customers whose orders he would then fill. Additionally, McDowell contacted the family who was assigned the telephone number TGS had formerly used to sell LaGrange welding rod and placed a message on their answering machine directing customers to call him to purchase LaGrange welding rod. Filing 10-8 at 12. And in approximately 2006, McDowell developed a website (at http://lagrangesupplycompany.com/) from which he sells welding rod branded

---

[3] There is some disagreement in the record as to when, precisely, McDowell began selling welding rod. In an affidavit from December 2014, McDowell averred that he has operated under the trade name LaGrange Supply Co. and sold LaGrange-branded welding rod from the fall of 1985. Filing 23-1 at ¶ 4. But in his deposition, taken in August 2014, McDowell testified that he had begun selling welding rod branded as LaGrange "[b]y '89." Filing 10-8 at 14. McDowell's statements are not necessarily inconsistent: if he began selling welding rod in 1985, he could honestly state that he had begun doing so "by 1989." On a motion for summary judgment, the Court's role is not to weigh the evidence or evaluate the credibility of witnesses. So, the Court will view the evidence in the light most favorable to McDowell, and for purposes of this motion will assume, he began selling welding rod branded as LaGrange in the fall of 1985.

as "LaGrange" under the LaGrange Supply Co. name, using a logo formerly used by LEC. Filing 10-8 at 15–16, 47–50. At some point in 2014, McDowell formed defendant LG Supply, a Nebraska limited liability corporation which he owns with his son. McDowell then assigned his interest in the LaGrange Supply Co. trade name to LG Supply. Filing 10-8 at 15, 46.

McDowell testified that he has long been aware that Farmer's Choice (i.e., TGS, and then JDR) was selling LaGrange welding rod, and that Braun was involved in selling LaGrange welding rod since before TGS existed. Filing 10-8 at 9, 19. McDowell also admitted that he had learned that JDR had applied for a federal trademark registration for LaGrange, but did not taken any action to challenge the registration. Filing 10-8 at 18. The parties dispute when Braun, JDR, or JDR's predecessors became aware of McDowell's activities. *See*, filing 49 at 6–8, 10–15; filing 52 at 8–13, 17–24. But as the Court explains below, that dispute is not material to the pending motions.

### IV. Vance's Expansion of McDowell's Business

From 1992 to 2013, James Vance was employed as a telemarketing salesperson for TGS and then JDR. In December 2013, JDR terminated his employment. Filing 10-8 at 9–11. Shortly thereafter, Vance arranged a meeting with McDowell, and the two reached an agreement. Specifically, McDowell purported to authorize Vance to sell, through telemarketing, welding rod branded as LaGrange and to use the LaGrange Supply Co. name. Filing 10-8 at 9–11. The record contains a copy of this "Tradename & Trademark License Agreement." Filing 10-8 at 25–36. In the agreement, McDowell, as "licensor," granted Vance (or more accurately, Vance's LLC) a license to use various permutations of the LaGrange name in connection with the sale of welding rod. Filing 10-8 at 25. In return, Vance agreed (among other things) to pay a percentage of his proceeds as a royalty and to be subject to certain quality control standards. *See* filing 10-8 at 26. Unlike McDowell, who had relied primarily upon people calling him, Vance commenced telemarketing operations, including making sales calls to JDR's clients. *See* filing 10-2 at ¶ 36.

Braun avers that, within approximately 1 month following Vance's termination, JDR learned, from contacts with its own customers, that defendants and their "agents/licensees" (i.e., Vance) were directly contacting JDR's customers, including those customers Vance had previously serviced while employed with JDR. Filing 10-2 at ¶¶ 36(a). Since then, JDR has begun tracking instances of confusion by its customers and others, and JDR has documented numerous instances in which a customer has expressed confusion concerning defendants (and Vance's) use of the LaGrange name.

*See generally*, filing 25-4; filing 40-1 at ¶¶ 6–11; *see also* filings 10-10 through 10-20.

STANDARD OF REVIEW

## I. Motion for Summary Judgment

The Court may grant summary judgment on all or part of a party's claim or defense. Fed. R. Civ. P. 56(a). Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

## II. Preliminary Injunction

When deciding whether to issue a preliminary injunction, the Court weighs the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013); (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). A preliminary injunction is an extraordinary remedy, and the

movant bears the burden of establishing its propriety. *Roudachevski v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 376 (2008).

## ANALYSIS

In its complaint, JDR asserts that defendants' conduct constitutes (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114(1); (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); and (3) a violation of the Nebraska Uniform Deceptive Trade Practices Act ("NUDTPA"), Neb. Rev. Stat. § 87–301 *et seq*. JDR has asserted various other theories of recovery in its complaint, but only these claims are before the Court at this time.

Defendants have filed a counterclaim, seeking cancellation of JDR's federal registration and alleging violations of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59–1601 *et seq*., and the NUDTPA. Defendants have since moved to dismiss their claim under the Nebraska Consumer Protection Act (filing 50), and that claim will be dismissed.

In its motion for preliminary injunctive relief, JDR asks the Court to enjoin defendants from using the LaGrange name in connection with the sale of welding rod. And in its motion for partial summary judgment, JDR asks the Court to enter judgment for JDR as to several portions of its claims noted above: for trademark infringement, unfair competition, and under the Nebraska Deceptive Trade Practices Act. JDR also asks the Court to dismiss defendants' counterclaim under the NUDTPA.

For reasons that will become clear, the Court will proceed in reverse of the usual order, and will begin by examining JDR's motion for partial summary judgment. The Court will grant JDR's motion as to its own claims. But the Court will deny JDR's motion as to defendants' counterclaims, which will be allowed to proceed. Finally, JDR's motion for a preliminary injunction will be denied as moot.

## I. JDR's Motion for Partial Summary Judgment (on JDR's Claims)

The elements of all of JDR's claims—for trademark infringement, for unfair competition, and under the NUDTPA—are essentially the same. So, for present purposes, the same analysis will—with some exceptions—govern all of these claims. *See, 1-800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406–07 (2d Cir. 2005); *Harley–Davidson Motor Co. v. Elworth's Harley–Davidson Sales & Service, Inc.*, 2010 WL 1427317, at *3 (D. Neb. April 8, 2010); *Mutual of Omaha Ins. Co. v. Novak*, 648 F. Supp. 905, 909 (D. Neb. 1986); *Prime Home Care, LLC v. Pathways to Compassion, LLC*, 809 N.W.2d 751, 764 (Neb. 2012).

To prevail on a claim of trademark infringement under 15 U.S.C. § 1114(1), a plaintiff must establish that (1) it owns a valid, protectable mark, (2) that defendants have used the mark in commerce without the plaintiff's consent; and (3) that there is a likelihood of confusion between the plaintiff's mark and the defendant's mark. 15 U.S.C. § 1114(1); *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 569 F.3d 383, 389 (8th Cir. 2009); *1-800 Contacts*, 414 F.3d at 406–07. A claim of unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), has the same elements, except that registration of the mark is not required. 15 U.S.C. § 1125(a)(1); *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2005); *1-800 Contacts*, 414 F.3d at 406–07. And conduct causing a likelihood of confusion also constitutes a "deceptive trade practice" under the NUDTPA. *See* Neb. Rev. Stat. § 87-302(a)(2) and (3).

JDR has not moved for summary judgment as to the likelihood of confusion, and so that element is not before the Court at this time. Most of the remaining elements are undisputed. There is no dispute that defendants have used the LaGrange mark in commerce. Nor do defendants claim to have received JDR's consent to use the mark. So, the fighting issue at this time is whether JDR owns a valid, protectable mark. And more specifically, the issue is whether JDR can show that it owned a valid, protectable mark prior to McDowell's first use of the LaGrange mark in 1985. First, however, the Court will consider JDR's current claim to ownership of the mark.

### A. JDR's Current Ownership of the Mark

There is no dispute that LEC was the first to use the LaGrange mark in connection with the sale of welding rod, and that this use extends back to at least 1970. JDR traces its interest in the mark all the way back to 1970 through a series of transactions between itself and TGS, TGS and LEC's creditors, and LEC's creditors and LEC. Defendants argue that there is a gap in this chain. They contend that there is no evidence that LEC's creditor, Ralston Bank, actually owned transferrable rights in the LaGrange trademark. They also point to the fact that Ralston provided TGS with only a quitclaim deed, arguing that this (somehow) renders JDR's claim suspect.

Both of defendants' arguments are without merit. First, there is no gap in JDR's chain of ownership. The undisputed facts, set forth above, show that Ralston Bank, in conjunction with its holding company, acquired all of LEC's assets, including the rights to the LaGrange name. The undisputed facts also show that TGS then purchased those assets, including the rights to the LaGrange name. And the undisputed facts show that LEC was allowed to continue using the mark while its assets were in the bank's possession, and thus there was no gap in the usage of the mark as it was transferred from LEC to its creditors, then to TGS, and finally to JDR.

- 8 -

Second, defendants' argument that the use of a quitclaim somehow renders TGS's acquisition of the mark infirm is not supported by the law. A quitclaim is an instrument of transfer whereby the grantor transfers only the interest the grantor has in the property at the time of conveyance. *Morello v. Land Reutilization Com'n of Cnty. of Douglas*, 659 N.W.2d 310, 314 (Neb. 2003). While a quitclaim deed does not provide any assurance that the grantor actually has good title to the property transferred, *see id.*, it is still as effective as any deed to transfer whatever interest the grantor does have. *See, United States v. Speidel*, 562 F.2d 1129, 1132 (8th Cir. 1977) (Iowa law); *Rust Land & Lumber Co. v. Wheeler*, 189 F. 321, 325 (8th Cir. 1911) (Arkansas law); *Crafts v. Pitts*, 162 P.3d 382, 384 n.2 (Wash. 2007); *Horn v. Gilley*, 428 S.E.2d 568, 569 (Ga. 1993); *Owen v. Potts*, 115 So. 336, 338 (Miss. 1928). In sum, the undisputed facts show that the LEC's creditors did acquire rights in the LaGrange mark, which they then transferred to TGS, which ultimately passed them on to JDR.

## B. Protection and Priority of Use

JDR must show that it owns a protectable mark and that it was the first to use the mark in commerce. Before proceeding further, it is necessary to set forth the general principles that determine which party has priority of use and whether a mark is protectable.

### 1. Ownership Is Controlled By Priority of Use

A trademark is a common law property right that exists independently of statutory provisions for registration. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 989 (9th Cir. 2006). Trademark rights are acquired and maintained through the use of a particular mark. *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007). In other words, a party's ownership of a protectable mark is determined on the basis of priority of use in commerce. *S. Cal. Darts Ass'n v. Zaffina*, 762 F.3d 921, 930 (9th Cir. 2014). Thus, the party claiming ownership must have been the first to actually use the mark in the sale of goods or services. *Id.*

The first party to use the mark in commerce establishes common law ownership in the geographic area where the mark is used and is known as the senior user of the mark. *Allard Enters., Inc. v. Advanced Programming Res., Inc.,* 249 F.3d 564, 572 (6th Cir. 2001). While federal registration of a mark serves as prima facie evidence of ownership and the registrant's exclusive right to use the mark in commerce, it does not eliminate the prior nonregistered, common law rights of others. So, the common law rights of the senior user are superior to the federal registration of a junior user within the senior user's geographic territory. *Id.* In other words, it is priority of use, not

federal registration, that creates exclusive property rights in a trademark. *In re Int'l Flavors & Fragrances, Inc.*, 183 F.3d 1361, 1366 (Fed. Cir. 1999). The owner of a trademark need not register his or her mark in order to use the mark in connection with goods or to seek to prevent others from using the mark. *Id.* Rather, registration affords certain supplemental rights and protections not provided by the common law. *Id.*

JDR registered the LaGrange mark in 2012. But McDowell has presented evidence that he began using the same mark as early as 1985. Thus, JDR's registration is ultimately of little significance to the Court's present analysis. Priority of use, however, still goes to JDR, which has presented undisputed evidence that it—through an unbroken chain of use in commerce by itself and its predecessors-in-interest—first used the mark in connection with the sale of welding rod at least as far back as 1970.

### 2. Marks Entitled to Protection

In addition to showing priority of use, JDR must show that the LaGrange mark is valid, i.e., protectable. A "trademark" is "any word, name, symbol, or device, or any combination thereof—used by a person . . . to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127; *Lovely Skin, Inc. v. Ishtar Skin Care Products, LLC*, 745 F.3d 877, 882 (8th Cir. 2014). To be protectable, a mark must be distinct. *Co-Rect Prods., Inc. v. Marvy! Adver. Photography, Inc.*, 780 F.2d 1324, 1329 (8th Cir. 1985). Distinctiveness comes in two forms: inherent and acquired. A mark is inherently distinctive if its intrinsic nature serves to identify a particular source. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002). A mark that is not inherently distinctive can acquire distinctiveness through attachment of secondary meaning (more on that below). *Id.*

To determine whether a mark is protectable, the Court must first categorize it. *Frosty Treats Inc. v. Sony Computer Entm't Am. Inc.*, 426 F.3d 1001, 1004 (8th Cir. 2005). Potential trademarks fall into one of four (or five) categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *Id.* A generic mark refers to the common name or nature of an article. *Id.* at 1005. A mark is descriptive if it conveys an immediate idea of the ingredients, qualities, or characteristics of the goods. Suggestive marks require imagination, thought, and perception to reach a conclusion as to the nature of the goods. *Id.* An arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 631 (6th

Cir. 2002). And a fanciful mark is a coined word or phrase, such as Kodak, invented solely to function as a trademark. *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n.7 (9th Cir. 1998).

Generic marks are not entitled to protection. Descriptive marks lack inherent distinctiveness, and are only entitled to protection if they are shown to have acquired secondary meaning. *Frosty Treats*, 426 F.3d at 1005. By comparison, suggestive, arbitrary, and fanciful marks are deemed inherently distinctive, and are entitled to protection regardless of whether they have acquired secondary meaning. *Id.*

The correct categorization of a given mark is a question of fact. *WSM, Inc. v. Hilton*, 724 F.2d 1320, 1326 (8th Cir. 1984); *see also, Juice Generation, Inc. v. GS Enters. LLC*, ___ F.3d ___, 2015 WL 4400033, at *5 (Fed. Cir. July 20, 2015); *Multi Time Mach., Inc. v. Amazon.com, Inc.*, ___ F.3d ____, 2015 WL 4068877, at *6 (9th Cir. July 6, 2015). The demarcation between each category is more blurred than it is definite; in other words, the categories from generic to fanciful or arbitrary exist on a continuum. *See, Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011); *DeGidio v. W. Grp. Corp.*, 355 F.3d 506, 512 (6th Cir. 2004). A mark's classification is determined with regard to the goods associated with the mark. *Fair Isaac Corp. v. Experian Info. Solutions, Inc.*, 650 F.3d 1139, 1147 (8th Cir. 2011). So, for example, "frosty treats" is (at best) descriptive when applied to frozen desserts. *Id.* And the test for descriptiveness is "what consumers, not persons in the trade, understand the term to be." *Id.*

JDR asserts, with no explanation, that the LaGrange mark is arbitrary or fanciful. It is not a coined term, so it is not fanciful. And JDR has presented no evidence or argument as to how the mark could be considered arbitrary. So, the mark is either descriptive or suggestive. Keeping in mind that the categorization of a mark is a factual issue, the Court finds, for purposes of the pending motions, that the mark is at least descriptive. The mark may, in fact, be suggestive, but a jury could reasonably find otherwise.

First, the LaGrange mark is apparently named for the founder and president of JDR's original predecessor, Dan LaGrange. And the general rule is that surnames, when used as trademarks, are inherently *in*distinctive, and are permitted trademark protection only upon a showing that they have acquiring distinctiveness through secondary meaning. *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 20 (1st Cir. 2004); *see also, Tana v. Dantanna's*, 611 F.3d 767, 774 (11th Cir. 2010); *Marker Int'l v. DeBruler*, 844 F.2d 763, 764 (10th Cir. 1988). Because a surname merely describes the *provider* of goods, it is considered descriptive as to those goods. *In re Major League Umpires*, 60 U.S.P.Q. 2d 1059, 2001 WL 777067, at *2 (T.T.A.B. 2001)

Second, the manner in which the LaGrange mark was registered suggests that it is not suggestive. The Lanham Act prohibits the registration of marks which are merely descriptive on the Principal Register, unless the mark has acquired secondary meaning—otherwise known as a § 2(f) registration. 15 U.S.C. § 1052(e)–(f); *Lovely Skin,* 745 F.3d at 882. And the Eighth Circuit has held that the submission of evidence under § 2(f) amounts to a concession that the mark sought to be registered is not inherently distinctive. *Aromatique, Inc. v. Gold Seal, Inc.,* 28 F.3d 863, 869 (8th Cir. 1994). JDR has submitted the certificate of registration for the LaGrange mark, which shows that it was registered under § 2(f). Filing 10-7 at 1. At the very least, this weighs against a finding of inherent distinctiveness and makes it inappropriate for the Court to find the mark suggestive as a matter of law.[4]

In sum, viewed in the light most favorable to defendants, the Court finds the LaGrange mark to be descriptive, rather than suggestive. As a result, JDR must show that the LaGrange mark has acquired secondary meaning.

### 3. Secondary Meaning

Secondary meaning is an association formed in the minds of consumers between the mark and the source or origin of the product. *Frosty Treats,* 426 F.3d at 1006. To establish secondary meaning, a plaintiff must show that its mark serves to identify its goods and distinguish them from those of others. *Id.* Secondary meaning does not require the consumer to identify a source by name but does require that the public recognize the mark and associate it with a single source. *Id.*

JDR must show not only that the LaGrange mark has acquired secondary meaning, but that it acquired that meaning before McDowell's first use of the mark in 1985. A "strictly logical priority rule would be to award ownership to the party who first achieved secondary meaning." 2 McCarthy on Trademarks and Unfair Competition § 16:34 (4th ed. 2015). But courts

---

[4] It has also been held that when a claim of acquired distinctiveness is made in the alternative or after objecting to the examiner's refusal, the claim does not constitute a concession that the matter sought to be registered is not inherently distinctive. *See The Learning Internet v. Learn.com, Inc.,* 2009 WL 6059550, at *35 (D. Or. Nov. 25, 2009) (citing *Gen. Foods Corp. v. Mgd Partners,* 224 U.S.P.Q. (BNA) 479, 485, 1984 WL 63162, at *6 (T.T.A.B.1984)); Trademark Manual of Examining Procedure § 1212.02(c) (July 2015), *available at* http://tmep.uspto.gov/RDMS/detail/manual/TMEP/current/d1e2.xml. The possibility of registration with objections was not discussed in *Aromatique.* It may be that JDR pursued this sort of application, but the Court cannot tell from the existing record. So, the Court hesitates to give *conclusive* weight to JDR's registration under § 2(f).

instead utilize an "easier-to-apply but stricter surrogate test." *Id.* Thus, "[p]riority depends not upon which mark succeeds in first obtaining secondary meaning but upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning at the time the defendant commenced his use of the mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3d Cir. 1978); *see also, Knights Armament*, 654 F.3d at 1189; *PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 564 (2d Cir. 1990); *Co-Rect Prods.*, 780 F.2d at 1330. "If the senior user cannot demonstrate that its use of the term acquired secondary meaning before the junior user commenced its use, there can be no infringement, 'for if there was no secondary meaning, there was no likelihood of confusion when the junior user arrived on the scene.'" *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J.*, 894 F. Supp. 2d 288, 317 (S.D.N.Y. 2012) (quoting 2 McCarthy on Trademarks § 16:34).

Whether a mark has acquired a secondary meaning is a question of fact. *Lovely Skin*, 745 F.3d at 884. A trademark user establishes secondary meaning by showing, that through long and exclusive use in the sale of the user's goods, the mark has become so associated in the public mind with such goods that the mark serves to identify the source of the goods and to distinguish them from those of others. *First Bank v. First Bank Sys., Inc.,* 84 F.3d 1040, 1045 (8th Cir. 1996). Although direct evidence such as consumer testimony or surveys are most probative of secondary meaning, it can also be proven by circumstantial evidence. *Frosty Treats*, 426 F.3d at 1005. Such circumstantial evidence includes the exclusivity, length and manner of use of the mark; the amount and manner of advertising; the amount of sales and number of customers; the plaintiff's established place in the market; and the existence of intentional copying. *Id.* at 1005–06.

JDR has presented evidence that, thanks to its efforts and exclusive use, the LaGrange mark had acquired secondary meaning by 1985. JDR's evidence on this matter is not overwhelming, but it is entirely undisputed. Thus, the Court finds that, even viewing the record in the light most favorable to defendants, JDR has presented sufficient circumstantial evidence of secondary meaning to be entitled to partial summary judgment.

### (a) Exclusivity, Length, and Manner of Use

By 1985, JDR's predecessor LEC had used the LaGrange mark in connection with the sale of welding rod for 15 years. There is no evidence that anyone else was using the mark during that period. Fifteen years of exclusive use is not insignificant. 15 U.S.C. § 1052(f) states that the trademark commissioner may accept proof of five years' exclusive and continuous use of a mark as prima facie evidence of secondary meaning. "This suggests that

five years' use is a strong factor in favor of secondary meaning: '[T]he general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).'" *Stuart Hall Co., Inc. v. Ampad Corp.*, 51 F.3d 780, 789 (8th Cir. 1995) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

### (b) Marketing Efforts

JDR has presented an affidavit from Braun describing its marketing efforts. Braun avers that JDR and its predecessors have spent much time and substantial resources in promoting LaGrange welding rod and the LaGrange brand; that they have established sales offices in several Nebraska cities, as well as one in Missouri; and that they employ over 125 salespeople to market LaGrange welding rod. Filing 10-2 at ¶ 23. And Braun avers that JDR and its predecessors have regularly participated in tradeshows across the county, providing free samples and running welding demonstrations, and then following up with potential customers. Filing 10-2 at ¶ 24. However, Braun's affidavit does not detail *when* these marketing efforts took place, and so it provides little basis for determining whether secondary meaning had attached by 1985.

Braun also averred that "commencing in the 1980s," JDR's predecessors established a telemarketing department which has expanded the sale of LaGrange welding rod from a "merely regional customer base located mostly between Texas and North Dakota and between Colorado and Illinois, to a nationwide and international customer base." Filing 10-2 at ¶ 31. But once more, Braun's affidavit is short on chronological details, and the Court cannot determine the extent to which these telemarketing efforts took place before 1985.[5]

### (c) Intentional Copying

Intentional copying of another's mark supports an inference of secondary meaning, at least where the evidence supports an inference that the junior user copied the mark in order to capitalize on the existing goodwill associated with the mark. *See Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 375–76 (E.D.N.Y. 2007). Conscious replication may be persuasive evidence of secondary meaning, but is not itself

---

[5] The Court has, of course, given no weight to Braun's conclusory (albeit uncontroverted) statements that the LaGrange mark is "extremely well known throughout the United States," that the mark has acquired secondary meaning, and that the mark has accumulated substantial goodwill. *See, e.g.*, filing 10-2 at ¶¶ 22, 26–30, 32. And in any event, Braun has not averred that the mark achieved this status by 1985.

sufficient to establish secondary meaning. *Id.* The inference of secondary meaning can be rebutted if the junior user offers another explanation for the copying—for example, the mark's "intrinsic consumer-desirability." *Id.*

McDowell adopted the LaGrange mark shortly after he left employment with LEC. He then used the mark to sell the same product he had formerly sold with LEC. McDowell has not offered an explanation for why he would use the mark other than to capitalize on the existing goodwill associated with the mark. So, McDowell's adoption of an identical mark supports an inference of secondary meaning.

### (d) Secondary Meaning Was Established by 1985

Weighing the factors above, the Court finds that there is no genuine dispute of fact that the LaGrange mark had acquired secondary meaning by 1985. While JDR's evidence of its marketing efforts is of little to no probative value, the remaining factors—continuous, exclusive use for 15 years and McDowell's intentional copying—support a finding of secondary meaning.

That finding is bolstered by the nature of the LaGrange mark itself. While the LaGrange mark may be descriptive, it is closer to the suggestive end of the spectrum than the generic or "merely" descriptive end. Generally, the more descriptive the term, the greater the evidentiary burden to establish secondary meaning. *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432, 441 (3rd Cir. 2000) (citing 2 McCarthy § 15:28). So, conversely, the more suggestive the term, the less evidence of secondary meaning is required.

Professor McCarthy has articulated six questions that may aid in determining whether a mark is descriptive or suggestive. 2 McCarthy § 11:71; *see also DeGidio,* 355 F.3d at 510–11 (utilizing these questions). Summarized and condensed, those questions are:

(1)   How much imagination on the buyer's part is required in trying to cull a direct message from the mark about the quality, ingredients or characteristics of the product?

(2)   Does the mark directly convey a real and unequivocal idea of some characteristic, function, quality, or ingredient of the product or service to a reasonably informed potential buyer?

(3)   Does the mark so closely tell something about the product or service that other sellers of like products would be likely to want to use the term in connection with their goods?

> Perhaps a more realistic way to pose this question is to ask whether, without any prior knowledge of this mark, others would be likely to want to use it to describe their products?
>
> (4)    Are, in fact, other sellers now using this term to describe their products?
>
> (5)    Even though the mark may tell something about the goods or services, is it just as likely to conjure up some other, purely arbitrary connotation?
>
> (6)    How does the mark fit into the basic concept that descriptive marks cannot pinpoint one source by identifying and distinguishing only one seller? That is, are buyers likely to regard the mark really as a symbol of origin, or merely as another form of self-laudatory advertising?

*Id.*

Although the term "LaGrange" conveys an immediate idea of the provider of the product (Dan LaGrange's company, LEC), it otherwise describes nothing about plaintiff's welding rod. It is not as if plaintiff's predecessors had adopted the mark "WELD-STRONG" or "STURDY-ROD." Similarly, there appears to be nothing about the name "LaGrange" that evokes a desirable, descriptive connotation (such as "Samson" for strength), such that other sellers, unfamiliar with LEC, would want to use the LaGrange mark to describe their welding rod. And the record shows that from 1970 to 1985, no other sellers were, in fact, using the mark to sell welding rod. The Court lacks the information to analyze the fifth question— "LaGrange" may or may not evoke other, arbitrary connotations to the average consumer. As to the final factor, the Court finds that buyers would likely regard the mark as a symbol of origin, and not merely a form of self-laudatory advertising. Indeed, personal names (while presumptively descriptive), "are frequently adopted as trademarks and readily recognized as such by consumers. Their prima facie lack of distinctiveness may thus be overcome more easily than in the case of descriptive terms." Restatement (Third) of Unfair Competition § 13 cmt. e (1995).

In sum, while the LaGrange mark is descriptive, it is not far removed from the suggestive boundary, and this, combined with JDR's other undisputed evidence, shows that secondary meaning was established by 1985. Defendants do not argue otherwise, and the Court finds that JDR is entitled to summary judgment on this point. So, with the exception of the

element of likelihood of confusion, JDR is entitled to summary judgment on the remaining elements of its claims of trademark infringement, unfair competition, and for violations of the NUDTPA.

### C. Laches and Statute of Limitations

Defendants counter that JDR is not entitled to partial summary judgment because its claims are barred by the statute of limitations or laches. There is no statute of limitations under the Lanham Act; instead, it expressly provides for the defensive use of "'equitable principles, including laches.'" *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1974 n.15 (2014) (quoting 15 U.S.C. § 1115(b)(9)). Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted. *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999). The NUDTPA, on the other hand, does have a statute of limitations. Civil actions under the NUDTPA may "be brought only within four years from the date of the purchase of goods or services." Neb. Rev. Stat. § 87-303.10. It is not entirely clear how this statute of limitations applies to the present case.

The Court declines, at this time, to resolve either the issue of laches or the statute of limitations under the NUDTPA. First, as a matter of procedure, these issues are not properly before the Court. Both are affirmative defenses. JDR has moved for partial summary judgment, but defendants have not filed a cross-motion raising these defenses. Resolving these issues is unnecessary to resolving JDR's partial motion for summary judgment.

Second, the Court requires further input from the parties before it can readily evaluate either defense. As noted above, it is not entirely clear how the NUDTPA's statute of limitations applies in the present case. Specifically, defendants have not explained when the statute should have begun to run. The Court is not inclined to develop defendants' legal arguments on their behalf. Similarly, the issue of how laches should be applied in this case is not amenable to resolution at this time. Laches is an equitable doctrine and its application is inherently fact-intensive.[6] However, in order to aid the parties moving forward, the Court will make a few general observations about the application of laches to this case.

---

[6] This is not to say that the issue could not be resolved on a further motion. But on the current record, there are important matters that are under-developed or disputed. For example, questions remain about when JDR first knew (or should have known) of McDowell's use of the LaGrange mark. These and other important considerations bearing on the equities of this case would benefit from further attention and briefing.

Laches is a valid defense to claims for both monetary damages and injunctive relief. *See Glenn Miller Prods.*, 454 F.3d at 997. That said, courts are generally more reluctant to apply the doctrine to claims for prospective injunctive relief, especially if the infringing use is causing consumer confusion. *See, e.g., Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 461 (4th Cir. 1996). Courts may (and should) tailor application of laches to fit the facts and equities of each case. Thus, even if laches bars certain damages in this case, it may not bar prospective injunctive relief. The scope of injunctive relief can likewise be tailored.

The Court notes that McDowell apparently used the LaGrange mark for over 20 years without causing any significant consumer confusion. JDR claims that defendants "have essentially laid low in the weeds for a number of years." Filing 52 at 23. But that is not necessarily a fair characterization of the facts. McDowell obtained a state registration for use of the tradename "LaGrange Supply Co." in 1997 and renewed it in 2007, and has been operating a website since 2006, which is easily located using an internet search engine. *See* filing 23-10. This state registration, of course, did not affect the parties' respective rights to the trademark under the common law. That would be true even if McDowell had obtained a state registration for the LaGrange trademark. *See* Neb. Rev. Stat. § 87-143. But it may still provide at least some degree of constructive notice to JDR that McDowell was claiming ownership of the LaGrange mark. And that matters, for purposes of determining when JDR knew *or should have known* of McDowell's use of the mark.

On the current record, it appears that consumer confusion did not actually arise until Vance joined defendants and began marketing more aggressively and directly to JDR's customers. So, depending upon the evidence adduced, equity would likely demand that Vance be enjoined from using the mark. His use is causing confusion, and he has only been using it for a short time; soon after he started, JDR began pursuing action against him. But equity might also be served by allowing McDowell to carry on with his previous, passive marketing using the LaGrange mark. McDowell may not have relied upon JDR's inaction by, for example, investing substantial sums into his version of the mark. But he has relied upon the mark for the past 20-plus years, and that's not nothing.

In sum, the issue of laches may not be as straight-forward as both parties have made it out to be, and the Court declines to wade into the matter without the benefit of a more fully-developed factual record. (And even then, it is quite possible that there will remain disputed issues of material fact.)

## II. JDR's Motion For Summary Judgment on Defendants' NUDTPA Counterclaim

In their counterclaim, defendants allege that JDR has violated the NUDTPA by disparaging defendants, making false claims to the public, and interfering with product suppliers. Filing 18 at 6–7. More specifically, defendants allege that:

1.  Since January of 2014, JDR has disparaged Defendants' LaGrange branded welding rods as inferior and as imitation rods from an untrusted source.
2.  Since January of 2014, JDR has told members or the public that Defendants' use of the LaGrange mark was illegal and unauthorized.
3.  Beginning in September of 2014, JDR has contacted wholesale welding rod suppliers and demanded that each company cease doing business with the Defendants or face potential litigation.

Filing 18 at ¶¶ 32–34.

The NUDTPA provides that a person engages in a deceptive trade practice when, in the course of his or her business, he or she does one of the following (among other things):

> (2) Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
>
> . . . .
>
> (5) Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;
>
> . . . .
>
> (7) Represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; [or]
>
> (8) Disparages the goods, services, or business of another <u>by false or misleading representation of fact</u> . . . .

- 19 -

Neb. Rev. Stat. § 87-302(a) (emphasis supplied).

The Court will begin with the defendants' two allegations. JDR asserts that because it has a valid and protectable trademark which defendants have used without JDR's authorization, it is not false or misleading for JDR to disparage defendants' welding rods as inferior, imitation rods from an untrusted source; or to state that defendants' use of the LaGrange mark was illegal and unauthorized. Therefore, JDR argues, it is entitled to summary judgment on the defendants' NUDTPA claim.

The Court is not inclined to grant JDR summary judgment on the existing record and briefs. As to defendants' first allegation: defendants' welding rod may, or may not, be inferior, and from an untrusted source. The Court has no way of knowing from the facts before it. As to defendants' second allegation: JDR has only moved for *partial* summary judgment on its claims; therefore, the Court cannot yet say, as a matter of law, that McDowell's use of the LaGrange mark was illegal.

That brings the Court to McDowell's third allegation: that JDR has been contacting rod suppliers and threatening them with lawsuits if they continue to provide rods to McDowell. JDR has not specifically addressed this allegation, and, again, McDowell has not responded. This alleged conduct does not seem to fit within the deceptive trade practices enumerated within the NUDTPA. In that sense, summary judgment might be appropriate.

Here too, however, the Court is not inclined to grant summary judgment given the dearth of evidence and argument. If this third allegation does not form the basis for a claim under NUDTPA, then its inclusion in this case presents no real threat to JDR. However, this third allegation may form the basis for liability under another theory of recovery, such as tortious interference with business relationships. And it is the facts alleged in McDowell's counterclaim, not the legal theories of recovery, which control the Court's analysis. *See Topchian v. JPMorgan Chase Bank, N.A.*, 760 F.3d 843, 848–49 (8th Cir. 2014).

### III. JDR's Motion for Preliminary Injunctive Relief

JDR has also asked the Court to issue a preliminary injunction, enjoining defendants from using the LaGrange mark in connection with the sale of welding rod. JDR's request for injunctive relief will be denied as moot.

The same claims discussed above also underlie JDR's request for injunctive relief. So, as to the likelihood of success on the merits, the Court has already found that JDR has *actually* succeeded on the merits of most of the elements of its claims. The only element remaining is likelihood of confusion, which JDR will also likely succeed in proving, based on the defendants' use of an identical mark in the sale of identical goods, and based

on the actual consumer confusion that has resulted. *See Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 763 (8th Cir. 2010) (factors relevant to determining likelihood of confusion).

However, JDR's motion founders when it comes to the issue of irreparable harm. The problem is not that the harm that JDR is facing is insufficiently irreparable or likely to occur. The Court does not presume irreparable harm based solely on its finding of likely (or actual) confusion. *See, Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205 (3d Cir. 2014); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013). But JDR has recorded numerous instances of actual confusion among its customers, and on the facts of this case, that suffices to show a sufficient threat of irreparable harm. *See Herb Reed*, 736 F.3d at 1250. If that were the end of the matter, then the *Dataphase* factors would call for injunctive relief.[7] The problem for JDR is that it must also show that that the allegedly irreparable injury will be staved off by the requested injunctive relief. Injunctive relief is not appropriate when the allegedly irreparable harm will occur despite the injunction. *See United States v. Parish of St. Bernard*, 756 F.2d 1116, 1123 (5th Cir. 1985).

JDR has conceded that McDowell's prior, passive marketing activities did not result in any significant or detectable customer confusion. JDR admits that it only became aware of actual confusion among its customers when Vance began working with defendants. *See*, filing 25-2 at ¶ 20(f); filing 40-1 at ¶ 3(c); filing 51-1 at ¶ 12. In other words, if irreparable harm is occurring, it is flowing from Vance's telemarketing operations. JDR has not shown that McDowell's "passive" sales are likely to cause confusion or irreparable harm. And the fact that McDowell has been doing so for somewhere between 20 and 30 years belies any claim that his limited, passive operations are causing irreparable harm.

So, for an injunction to help JDR, it would need to bind Vance. Vance, however, is not a party to this case. And the general rule is that injunctions may not be enforced against nonparties. *See Nat'l Spiritual Assembly of Bahá'ís of U.S. Under Hereditary Guardianship, Inc. v. Nat'l Spiritual Assembly of Bahá'ís of U.S., Inc.*, 628 F.3d 837, 848 (7th Cir. 2010). There are exceptions to this general rule: injunctions may also bind the parties' officers, agent, servants, and attorneys. *Id.*; Fed. R. Civ. P. 65(d)(2)(B). But the relationship between McDowell and Vance is one of licensor and licensee;

---

[7] The remaining factors, the balance of harms and the public's interest, would not alter the Court's conclusion. While McDowell would certainly face harm if he were enjoined from using the LaGrange mark, it would not be enough to tip the scales in his favor. And the public interest would favor granting an injunction to protect JDR's superior trademark rights and prevent further consumer confusion.

Vance is not McDowell or LG Supply's employee. Nor has JDR pointed to facts suggesting that Vance is an agent of defendants. And a licensee is not necessarily an agent. *See, e.g.*, *Estate of Anderson v. Denny's Inc.*, 987 F. Supp. 2d 1113, 1130 (D.N.M. 2013); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 2008 WL 2157108, at *6 (M.D. Fla. May 21, 2008).

The Court raised these concerns with the parties prior to the hearing that was held on JDR's motion for a preliminary injunction. *See* filing 37. At the hearing, JDR clarified that it is not seeking an injunction against Vance, but only against the defendants in this case: McDowell and LG Supply. JDR believes that if McDowell and LG Supply are enjoined, Vance will likewise cease his infringing use, as Vance claims his authority to use the mark as flowing from McDowell. The problem with this argument, as the Court has already noted, is that McDowell's sales are not causing irreparable harm. And since McDowell and LG Supply are not causing irreparable harm, injunctive relief against them is inappropriate.

But although Vance is not a party to this case, he is represented by the same counsel who represents the defendants here. And JDR is correct when it states that Vance is asserting a right to use the mark based on his authorization from McDowell. At the hearing on JDR's motion for preliminary injunctive relief, defense counsel made the following statement: "[I]f this Court rules that JDR owns the mark, then--then that's it. We're done. I mean, Vance is not gonna sell. It--we're done. It--whether on a preliminary injunction or summary judgment, our clients are done." Filing 47 (audio recording of hearing) at 17:05–17:50).[8]

The Court has ruled that JDR owned the mark, and that it acquired a protected interest in the mark prior to McDowell. And while McDowell may or may not have a laches defense to some or all of JDR's requested relief, Vance will have a much harder time presenting such a defense. JDR has not inexcusably delayed in seeking to stop Vance from infringing upon its trademark, and it will be difficult for Vance to show reliance. In light of defense counsel's statements and the Court's ruling on JDR's motion for partial summary judgment, it appears that an injunction will not be needed in order to curtail Vance's activities. Therefore, the Court will deny JDR's motion for preliminary injunctive relief as moot.[9] Accordingly,

[8] Indeed, Vance has moved to stay JDR's suit against him in state court, on the basis that the present motion for summary judgment "may directly address" Vance's right to use the mark. See filing 40-2 at 75.

[9] Of course, JDR may renew its request for preliminary injunctive relief if, moving forward, Vance (or McDowell) use the LaGrange mark in such a way as to cause irreparably harmful consumer confusion or damage to JDR's goodwill.

IT IS ORDERED:

1.  JDR's Motion for Preliminary Injunction (filing 8) is denied as moot.

2.  JDR's Motion for Partial Summary Judgment (filing 34) is granted in part and denied in part, as set forth above.

3.  Defendants' Motion to Dismiss Second Cause of Action of Defendants' Counterclaim (filing 50) is granted. Defendants' claim under the Nebraska Consumer Protection Act is dismissed.

Dated this 4th day of August, 2015.

BY THE COURT:

John M. Gerrard
United States District Judge